UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | } | |
| | } | |
| v. | } | |
| | } | |
| MARCUS LAQUON MADDOX, | } | Case No.: 4:19-cr-89-RDP-GMB |
| | } | |
| Defendant. | } | |
| | } | |
| | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant Marcus Laquon Maddox's ("Maddox" or "Defendant") Motion to Suppress Evidence. (Doc. # 11). In his Motion, Defendant seeks to suppress evidence he contends was illegally obtained when he was subjected to a stop and pat search of his person on November 9, 2017. (*Id*. at 1). Specifically, Defendant contends that officers from the Fort Payne Police Department violated his Fourth Amendment rights when they performed (1) an investigatory stop that was not supported by a reasonable and articulable suspicion of a crime and (2) a pat search of his person that was not supported by reasonable suspicion that he was armed and dangerous. (*Id*.). The pat search of Defendant revealed a loaded pistol. After conducting a suppression hearing on May 16, 2019, the court ordered the parties to submit supplemental briefing. The Motion is now fully briefed (Docs. # 12, 19-20) and ripe for review. After careful consideration, and for the reasons explained below, the court concludes that Defendant's Motion to Suppress Evidence (Doc. # 11) is due to be denied.

**I.     Findings of Fact**

During the hearing, the court heard testimony from a single witness: Officer Levi Bates.[1] The court also accepted into evidence and reviewed three body camera videos from the responding officers.[2] After considering the testimony at the suppression hearing, assessing the witness's credibility, and observing the three body camera videos of the incident, the court makes the following factual findings:

1.      On Thursday, November 9, 2017 at approximately 11:15 p.m., the Fort Payne Police received a call that a suspicious male and female had approached the caller's car at an ATM machine at BBVA Compass Bank, located at 200 Gault Avenue in Fort Payne, Alabama.

2.      Officers Levi Bates, Matthew Jones, and Nick Hill responded to the call.

3.      The Officers did not know the identity of the caller.

4.      As he was driving toward the bank, Officer Bates saw two people he believed matched the description of the two people from the report. He stopped them as they were walking on the sidewalk in front of the Police Department, which is about two blocks from the bank. Both individuals were wearing warm clothing and jackets. The female was barefoot.

5.      Officer Bates recognized both individuals from prior night patrols and identified them as Marcus Maddox and Juliana Blankinship. He specifically recognized Defendant from prior encounters involving drug activity.

---

[1] Defendant's Motion (Doc. # 11) identifies Officer Bates as Officer Stacey Bates. Officer Bates is currently employed by the Fyffe Police Department. He has five years of experience in law enforcement, three of which he spent on patrol. At the time of this incident, Officer Bates had been with the Fort Payne Police Department for one year.

[2] The Government presented a compilation of two segments of body camera footage. The first segment was pulled from Officer Nick Hill's body camera, and the second was pulled from Officer Bates's body camera. Defense counsel also submitted the full nine minute and thirty-nine second video from Officer Bates's body camera. The following findings of fact are gleaned from each of these videos.

6. Officer Bates pulled up in his patrol car and called Defendant by his first name. Defendant was walking a few feet ahead of Blankinship.

7. Officer Bates instructed Defendant to come to him. Although Blankinship stopped walking and stayed with the Officers on the sidewalk, Defendant continued to walk down the sidewalk.

8. Defendant finally stopped, walked back towards the Officers, and sat on top of a concrete planter.[3]

9. Officer Bates was equipped with a body camera. After about thirty seconds of interacting with Defendant and Blankinship, he activated his body camera and recorded the events.

10. The Officers did not immediately search Defendant and Blankinship. Instead, they conducted a field interview. Officer Bates asked Defendant and Blankinship why they had been approaching cars at the ATM.

11. After Officer Bates began recording, Officer Nick Hill radioed to dispatch, asking for a "10-29 check on Marcus Maddox." As Officer Bates explained, a 10-29 check is a search for outstanding warrants. The Officers did not ask for a 10-29 check on Blankinship.

12. Blankinship took the lead in the conversation with the police officers. In comparison, Defendant offered very few responses to the Officers' questions. Blankinship told the Officers that she was the one approaching bank customers asking for a ride back home to 2004 Gault Avenue.[4] She said she was asking for a ride because her sister left them and she was not wearing any shoes.

---

[3] During the hearing, the parties described Defendant's position as seated on a trash can. However, after closer inspection of the body camera footage, it appears he was seated on a concrete planter. The difference is not material for purposes of the court's analysis.

[4] Officer Bates confirmed that this address was about three or four miles down the road from their location in front of the police department. The court also notes that Officer Bates's testimony suggested that he was not convinced by Blankinship's explanation while conducting the field interview.

13. About thirty seconds into the field interview, Officer Bates advised the other officers that they should pat down Defendant. However, at that point, none of the officers initiated the pat down, and Officer Bates continued the field interview.

14. Even though there was not an immediate pat down of Defendant, Officer Bates testified that, at that moment, Defendant and Blankinship were not free to leave.

15. Shortly thereafter, dispatch radioed back, "negative 29," which was an indication that there were no outstanding warrants for Defendant.

16. Officer Bates had encountered Defendant on previous occasions. He noted a change in Defendant's behavior on this night, however. His prior interactions with Defendant typically involved the possession of narcotics. They did not involve the possession of firearms or any violence towards officers. Some, but not all, of these encounters resulted in a pat down. But, on each of these prior encounters, Defendant willingly conversed with the officers and complied with their instructions to approach.

17. This time, Defendant appeared nervous and fidgety, and at least initially refused to walk back toward the Officers when asked to do so. Even after returning, he continued to sit on top of the concrete planter, rapidly shaking his foot.

18. At this point in the field interview, the Officers did not see a gun or any other weapon. They also did not see or smell any drugs.

19. Due to Defendant's unusual behavior, the late hour, and the report that Defendant and Blankinship had been approaching cars at a nearby ATM, Officer Bates became suspicious that Defendant was engaged in criminal activity and concerned he was possibly armed.

20. As a result, Officer Bates asked Defendant if he had anything illegal on his person. Defendant replied that he did not.

21. The Officers did not ask Blankinship if she had anything illegal on her person.

22. Forty seconds or so after he advised the Officers to pat down Defendant, Officer Bates ordered Defendant to "hop off" so he could initiate a pat down of Defendant's outer clothing in order to ensure officer safety.

23. The Officers did not pat down Blankinship.[5]

24. While conducting the pat down down, Defendant began to act even more nervous and began reaching in his pockets. The Officers instructed him to stop reaching and remain still. As Officer Bates raised up the front of Defendant's jacket, a loaded firearm fell to the ground from the waistband of his pants.

25. As the Officers began to handcuff Defendant, Blankinship exclaimed that Defendant would not hurt them and that the gun did not belong to them. She said that someone named Sidney Davis asked them to hold the gun while he went somewhere. The Officers also handcuffed Blankinship.

26. The Officers arrested Defendant and transported him to the Fort Payne Police Department.

27. Officer Bates prepared a report following the arrest. The court notes that he did not, however, note in his report his impression that Defendant appeared nervous and fidgety *prior* to the pat down. Instead, he wrote, "I began patting Maddox down and he became nervous and kept moving around as if he was trying to hide something." Nevertheless, the court credits his testimony that Defendant was acting nervous before the pat down and differently than he had on previous

---

[5] During the suppression hearing, Officer Bates testified that they did not pat down Blankinship because there was no female officer on duty. According to Officer Bates, it was the policy of Fort Payne Police Department to only allow female officers to pat down female detainees. If Blankinship possessed a weapon in the officers' plain view, Officer Bates testified that they would be entitled to retrieve it. If, however, a weapon was not in plain view but the officers determined there was a threat to officer/citizen safety, the Department's policy would be to wait for a female officer to conduct the pat down.

occasions when interacting with Officer Bates. This made Officer Bates suspicious about Defendant's behavior and actions.

28. Defendant was charged with state violations alleging he was in possession of an altered firearm and carrying a concealed pistol without a permit.

**II. Analysis**

Defendant seeks to suppress all evidence obtained from what he contends was an unlawful investigatory stop followed by an illegal pat search. (Docs. # 11 at 1; 19 at 4-11). He contends that neither the stop nor the pat down was proper. (*Id.*). In particular, he claims that the stop was not based upon a reasonable suspicion of criminal activity (Doc. # 19 at 4-6), and the pat search was not supported by a reasonable suspicion that he was armed and dangerous (*Id*. at 6-11). For the reasons explained below, the court disagrees and concludes that Defendant's Motion is due to be denied.

### A. The Officers Had a Reasonable Suspicion Sufficient to Conduct a Warrantless, Investigatory Stop

A police officer may conduct "a brief, warrantless, investigatory stop of an individual when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Hunter*, 291 F.3d 1302, 1305-1306 (11th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1, 27, 88 (1968)). In determining whether reasonable suspicion exists, "the court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Id*. at 1306 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal quotations omitted). This approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *Id*.

The threshold question the court must answer is at what point did the Officers' field interview of Defendant and Blankinship become a *Terry* stop requiring reasonable suspicion. Police officers do not violate the Fourth Amendment's prohibition of unreasonable seizures simply "by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). Even when officers lack suspicion, they "may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *Id*. at 201 (citing *Florida v. Bostick*, 501 U.S. 429, 434-45 (1991)). As long as "a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *Id*.

Here, Officer Bates testified (and Defendant does not appear to dispute) that he first determined that Defendant and Blankinship were not free to leave about thirty seconds into the field interview, when he advised the other officers to pat Defendant down.[6] Identifying this as the moment when the investigatory stop began makes sense in light of the conversation up to that point. The Officers approached Defendant and Blankinship while walking on the side of the road late at night and asked them what they were doing and where they were going. The body camera videos show that the Officers spoke in measured tones and did not elicit answers from Defendant and Blankinship by using any coercive tactics. Thus, that initial questioning of Defendant and Blankinship did not convert the field interview into an investigatory stop triggering a reasonable suspicion requirement. Rather, the court agrees that the investigatory stop was initiated when Officer Bates advised the other officers to pat Defendant down. No reasonable person in the shoes of Defendant and Blankinship would feel free to terminate the encounter after hearing Officer Bates's instruction.

---

[6] Recall, however, that the Officers did not actually perform the pat search until the one minute and ten second mark in the video—forty seconds after Officer Bates advised the others to pat down Defendant.

Having determined when the investigatory stop began, the court turns to the question of whether the stop was supported by reasonable suspicion. Defendant primarily argues that the stop was unjustified because the 911 tip alone was insufficient to create reasonable suspicion. (Doc. # 19 at 5-6). Specifically, Defendant takes issue with the fact that Officer Bates did not know the identity of the caller and neither he nor the caller reported observing any illegal activity. (*Id.* at 5). The caller reported only that a suspicious male and female had approached his or her car at an ATM sometime close to midnight. Although Defendant acknowledges that Officer Bates acted within his duties in responding to a citizen's call reporting suspicious persons, he asserts that without more, the call did not justify the investigatory detention. (*Id.*).

The court acknowledges that in order to establish reasonable suspicion for the purposes of a *Terry* stop, a tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). And, unlike a tip from a known informant whose reputation can be assessed, "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Id.* at 270 (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)). But, "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Id.* (internal quotations omitted). For example, if an anonymous call provides predictive information about the suspect's actions, such knowledge would indicate reliability through familiarity with the suspect's affairs. *Id.* at 271.

The court admits that whether the 911 call, standing alone, provided Officer Bates with reasonable suspicion to perform the investigatory stop is a close question. Indeed, Officer Bates had no means by which to judge the credibility of the 911 caller's report because (1) he did not know the identity of the caller and (2) the caller provided no predictive information concerning

Defendant's actions. *See J.L.*, 529 U.S. at 271 (finding that the anonymous tip lacked reliability partly because it provided no predictive information, and therefore left the police without a means to judge the caller's knowledge or credibility). Additionally, the caller did not report the observation of illegal activity. *See United States v. Brown*, 636 F. App'x 514, 519 (11th Cir. 2016) ("When an informant has personal knowledge of the crime, including viewing the crime in progress, that basis of knowledge lends significant support to the tip's reliability.") (internal quotations omitted).

However, even if the caller's tip lacked sufficient indicia of reliability to provide reasonable suspicion to justify an immediate *Terry* stop, that did not preclude Officer Bates from conducting a field interview with two persons who were walking near the bank in question and who fit the description indicated by the dispatcher. After conducting a field interview, Officer Bates made several observations on the scene, in light of his police training and prior knowledge of Defendant, that corroborated the call and justified an investigatory stop. To be sure, "[t]he reasonableness of official suspicion must be measured by what the officers knew before conducting their search." *J.L.*, 529 U.S. at 271. And, as discussed above, the field interview did not become an investigatory stop until about thirty seconds into the field interview when Officer Bates advised the other officers to pat Defendant down. Everything the Officers observed up to that point -- including Defendant's nervous behavior, initial hesitation to return and talk to the Officers, different approach to Officer Bates during this encounter compared to previous ones, his and Blankinship's proximity to the bank, and the fact that he and Blankinship matched the description of those complained about -- further informed their reasonable suspicion that Defendant was possibly engaged in criminal activity.

Defendant cites *Florida v. J.L.*, 529 U.S. 266 (2000), but that case is readily distinguishable. In *J.L.*, police responded to an anonymous tip that a young African-American male in a plaid shirt was standing at a particular bus stop and carrying a gun. *Id*. at 268. When the officers arrived, they saw three African-American males at the bus stop "just hanging out," one of which was wearing a plaid shirt. *Id*. "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements." *Id*. Nevertheless, the officers ordered J.L. to put his hands up, frisked him, and seized a gun from his pocket. *Id*. The Supreme Court concluded that the anonymous tip was not enough to provide the officers with reasonable suspicion to justify the stop because "[a]ll the police had to go on…was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id*. at 271.

Unlike *J.L.*, where the officers' suspicion "arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller," *id*. at 270, the Officers here had the added benefit of the information yielded during the thirty second field interview. During the interview, the Officers observed several unusual circumstances that heightened their suspicion. As a starting point, Blankinship and Defendant were walking alone on the street close to midnight near the bank in question. The two met the description of the persons referenced by the dispatcher. Admittedly, at this point, this case looks like *J.L.* But, there is more.

In response to the Officers' questions, Blankinship informed them that she and Defendant were walking three to four miles home; however, Blankinship was barefoot in November. She also told the Officers that she (not Defendant) had approached a customer's car at the ATM because she was asking for a ride home. It was clear from Officer Bates's testimony at the suppression

hearing that he was not convinced by Blankinship's explanation. Each of these on-the-scene observations contributed to the Officers' reasonable suspicion that criminal activity was afoot. Again, there is more.

The Officers had a prior relationship with Defendant that informed their reasonable suspicion that he was possibly engaged in criminal activity. When Officer Bates first spotted Defendant and Blankinship, he immediately recognized Defendant from prior encounters related to drug activity and called him by name. Crucially, Defendant did not stop walking when Officer Bates summoned him. Indeed, he continued walking, then turned around and sat on top of a concrete planter. Unlike their prior encounters, Defendant spoke quietly and offered very few responses to the Officers' questions. Previously, during Officer Bates's encounters with Defendant, he freely conversed with the officers and promptly obeyed their commands to approach. Based upon the differences in their prior interactions and the one on this occasion, Officer Bates believed Defendant was nervous and fidgety. For these reasons, Officer Bates formed a sufficient reasonable suspicion about Defendant's conduct to perform the investigatory stop based on his law enforcement training and his past experiences dealing with Defendant. Accordingly, Defendant's Motion to Suppress is due to be denied with respect to his assertion that the investigatory stop was unlawful.[7]

---

[7] In his supplemental brief, Defendant makes much of the fact that Officer Bates did not identify in his testimony the specific offense he suspected Defendant committed. (Doc. # 19 at 4-5). But, the law requires only that a police officer have an articulable suspicion that some type of criminal activity is afoot. *Hunter*, 291 F.3d at 1305-1306 (citing *Terry*, 392 U.S. at 27, 88). Here, the logical inference arising from the report of two suspicious individuals approaching customers' cars at an ATM late at night would be that they were engaged in criminal behavior at or near the bank ATM. The court is satisfied that Officer Bates's observations (as articulated at the suppression hearing) supported his reasonable suspicion that Defendant was possibly engaged in criminal activity.

### B. The Pat Search Was Lawful Because the Officers Had Reasonable Suspicion That Defendant Was Armed and Dangerous

Having determined that the Officers conducted a lawful investigatory stop, the next issue is whether the Officers, prior to patting Defendant down, "harbor[ed] reasonable suspicion that [Defendant was] armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Under *Terry*, an officer may conduct a limited pat search for weapons if he has reason to believe that his own safety or the safety of others is at risk. *Terry*, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id*. Again, determining whether reasonable suspicion exists requires the court to "review the totality of the circumstances." *United States v. Bunkley*, 281 F. App'x 886, 888 (11th Cir. 2008).

Defendant argues that the Officers did not have reasonable suspicion that he was armed and dangerous because (1) the field interview provided several facts that led to inferences that would have dissipated suspicion (Doc. # 19 at 6, 11) and (2) many factors which courts consider persuasive in analyzing reasonable suspicion were not present in this case (*Id*. at 10-11). Specifically, Defendant notes that during the field interview, the Officers identified Defendant as an individual they knew, who typically did not carry firearms or exhibit violent behavior. (*Id*. at 6). He had also been cleared on a warrants check. (*Id*.). Additionally, Defendant notes that the incident occurred near the police station, an area not known for criminal activity.[8] The Officers

---

[8] *See Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (finding that police "are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation").

did not see a suspicious bulge in Defendant's clothing,[9] and the Officers were not outnumbered.[10] The court agrees that each of these factors may be considered in determining whether the totality of the circumstances demonstrates a reasonable suspicion that Defendant was armed and dangerous. But, Defendant underestimates the significance of three other factors: (1) the 911 call; (2) Blankinship's implausible explanation for their activity; and (3) Defendant's unusual and suspicious behavior, which stood in stark contrast with the Officers' prior encounters with him. For the reasons explained below, the court concludes that the Officers had a reasonable suspicion that Defendant was armed and dangerous, justifying the limited pat search for weapons.

First, the 911 call reported two suspicious individuals (who met Defendant's and Blankinship's description) approaching a car (or cars) at a bank ATM. That is certainly a factor indicating reasonable suspicion that Defendant was potentially armed and dangerous. Although the 911 call came from an unknown caller reporting only "suspicious" activity as opposed to a specific (possibly violent) crime (Doc. # 19 at 6-9), the court must consider the logical inference that arises from such a call. To be sure, a law enforcement officer would reasonably be attuned to such concerns as armed robbery from a report of two individuals approaching customers as they withdrew money from an ATM. Even before the Officers arrived on the scene, their prior police training likely led them to suspect that the individuals were engaged in illegal, possibly violent activity.

Second, Blankinship's explanation for their late-night presence near the bank did not dispel the Officers' suspicion once they arrived on the scene. Blankinship told them that she had been

---

[9] *See United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) ("[T]he presence of a visible, suspicious bulge on an individual may be considered in the totality of the circumstances.").

[10] *See United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010) (finding persuasive the fact that the officers were outnumbered two-to-one).

approaching customers' vehicles at the drive-through ATM to ask for a ride home because her sister left them. She also said that she and Defendant were walking to an address about three or four miles down the road. But, Blankinship was barefoot on a November night. As discussed above, Blankinship's implausible explanation contributed to the Officers' reasonable suspicion that criminal activity was afoot.

Finally, Defendant's behavior during the field interview worked to solidify the Officers' reasonable suspicion that Defendant was potentially armed and dangerous. Again, the Officers immediately recognized Defendant from prior investigatory stops and occasional pat downs related to drug activity. Crucially, they noticed several differences in his behavior that supported their reasonable suspicion that he was armed and dangerous. For example, when Officer Bates initially arrived at the scene, he asked the two to stop walking and come to him. Blankinship instantly stopped, but Defendant continued walking. While the court recognizes that this is not outright flight from an officer, *Hunter*, 291 F.3d at 1306, Defendant's reaction is significant when viewed within the context of Officer Bates's prior experiences with him. Typically, Defendant would instantly heed an officer's request to approach. Additionally, during the Officers' questioning, he offered few responses and spoke very quietly. Instead, he remained seated on the concrete planter and allowed Blankinship to command the conversation. This also struck Officer Bates as unusual because Defendant ordinarily spoke freely with law enforcement. Finally, Defendant appeared nervous prior to the pat search—he was fidgety and rapidly shaking his foot while sitting on the concrete planter.[11] This evasive behavior, contrasted with his behavior during prior encounters

---

[11] Although Officer Bates did not note in his report that Defendant appeared nervous and fidgety *prior* to the pat search, again, the court credits his testimony. The body camera videos clearly show signs of Defendant's nervousness. Also, during the field interview, Defendant spoke very quietly and rapidly shook his foot. The court attributes this behavior to nerves in light of Officer Bates's credible testimony comparing Defendant's behavior during this incident to his prior encounters with Defendant.

with Officer Bates, reasonably gave the Officers grounds to believe that Defendant was possibly carrying a concealed weapon and posed a risk to their safety.

In light of the totality of the circumstances, the court concludes that the Officers held a reasonable suspicion that Defendant was armed and dangerous, justifying their decision to perform a limited pat search for weapons. Accordingly, Defendant's Motion to Suppress is due to be denied.

### III. Conclusion

For the reasons explained above, Defendant's Motion to Suppress Evidence (Doc. # 11) is due to be denied. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this July 1, 2019.

*[signature]*
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE